[Cite as *State v. Mathis*, 2020-Ohio-3068.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No. L-18-1192

     Appellee                                Trial Court No. CR0201701128

v.

Robert Mathis                                    **DECISION AND JUDGMENT**

     Appellant                              Decided: May 22, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Robert Mathis, appeals the judgment of the Lucas County Court

of Common Pleas, following a jury trial, convicting him of one count of aggravated

murder in violation of R.C. 2903.01(A) and (F)[1], an unclassified felony, and sentencing

---

[1] Effective March 20, 2019, R.C. 2903.01(F) has been re-lettered to R.C. 2903.01(G).
References to the statute in this decision will be to the pre-amended version.

him to life in prison without the possibility of parole.  For the reasons that follow, we reverse.

## I.  Facts and Procedural Background

{¶ 2} On January 20, 2017, the Lucas County Grand Jury returned a two-count indictment against appellant, charging him with aggravated murder in violation of R.C. 2903.01(A) and (F), and murder in violation of R.C. 2903.02(B).  The charges stemmed from the June 8, 2011 death of Jennifer Molnar, appellant's domestic partner at the time.

{¶ 3} On May 30, 2017, the state filed its notice of intent to introduce other acts evidence.  Appellant replied to this notice on June 15, 2017.  On March 12, 2018, the trial court held a hearing on this issue, at which the state asserted that it intended to enter evidence regarding three separate alleged incidents involving appellant.  The first occurred on December 8, 2009, and involved allegations of appellant severely beating the victim, Jennifer Molnar.  The second and third incidents occurred on April 24, 2013, and June 27, 2014, respectively, and involved allegations of appellant severely beating his love interest at the time, R.B.  Appellant filed a supplemental memorandum against the notice on March 26, 2018, and the state replied to it on April 9, 2018.  After new counsel was appointed for appellant, appellant filed a second supplemental memorandum on August 20, 2018.  On August 24, 2018, the trial court entered an order allowing the state to present the other acts evidence with some limitations.

{¶ 4} Appellant's trial began on August 27, 2018.  The first witness to testify was Toledo Firefighter Daniel Desmond.  Desmond testified that on June 8, 2011, he was

2.

called to appellant's home in Toledo, Ohio. He arrived minutes after the call, and upon entering the house, found Molnar lying on an air mattress. Desmond testified that his immediate observation of Molnar was that she was dead, and a further examination revealed that her body was stiff. Molnar was pronounced dead on the scene at 8:57 p.m. A photograph of Molnar taken at the scene showed that she had significant and pervasive bruising all over her body, including her face, arms, and legs. Molnar also had significant burns on her face.

{¶ 5} Desmond testified that he spoke with appellant at the scene. Appellant stated that he had not seen Molnar since 10:00 a.m. Appellant explained that he left the house at 1:30 p.m., and returned around 3:00 p.m. When appellant returned, he tried the water and noticed that the hot water did not work. So, appellant went downstairs to check the hot water heater and found Molnar. Appellant stated that he carried her upstairs and put her on the air mattress. Appellant then called his mother. Appellant told Desmond that he did not believe Molnar was dead when he carried her upstairs, and he relayed that Molnar had been using crack, Suboxone, and Xanax.

{¶ 6} The state next called Toledo Police Officer Jeff Middleton. Middleton testified that he responded to the scene at approximately 9:27 p.m. Upon arrival, Middleton observed that Molnar had bruising and lacerations all over her body, as well as scalding on her face, forehead, and cheek area, and cigarette burns on her neck and a couple of other places on her body. Middleton testified that he spoke with appellant, and appellant explained that he found Molnar in the basement, lying on her stomach with her

3.

face facing up. Appellant led Middleton to the basement, and Middleton observed that the basement was flooded with approximately six inches of water, and water was still forcefully running from the hot water heater drain plug. Middleton testified that the water did not appear to be hot, and appellant walked right through the water to the hot water heater. Middleton observed appellant attempt to replace the hot water drain plug, but did not think that appellant actually intended to stop the flow of water. Middleton then directed appellant to turn off the water service shut-off valve, which he did. Appellant then described to Middleton that he found Molnar lying near the hot water heater, close enough that the water would have been gushing onto Molnar's body. Middleton described appellant's demeanor during this exchange as evasive. Middleton testified that appellant said that he had last seen Molnar alive at approximately 10:00 a.m. that morning. On cross-examination, Middleton acknowledged that it is possible that someone who had just found the dead body of a loved one would be nervous and distraught, and may have had difficulty replacing the drain plug because of shaking hands. However, on redirect, Middleton testified that appellant was not crying or hysterical, and that Middleton would describe appellant's demeanor as ashamed, not distraught.

{¶ 7} The next witness to testify was Toledo Police Officer Anthony Waldon. Waldon testified that he checked the scene for any signs of forced entry into the home, and did not find anything.

4.

{¶ 8} Retired Toledo Police Sergeant Bill Wauford testified next. Wauford spoke with appellant at the scene, and testified that appellant told him that he had last seen Molnar around 10:00 a.m., when Molnar got up to take a shower and appellant went back to sleep. Wauford described appellant's demeanor at the scene as cooperative and fairly calm. When Wauford asked appellant about the hot water heater, appellant indicated that when he got home he tried to wash his hands, but there was not any water pressure. So, appellant went down to the basement, where he found the victim. Appellant explained that he thought Molnar had gone to the basement where the hot water heater was, and opened the valve because the water was too hot.

{¶ 9} Wauford then testified that he spoke with Molnar's mother and brother, who informed him that about a year prior to June 8, 2011, appellant had been extremely violent toward Molnar, resulting in Molnar having to be hospitalized and spend some time in the intensive care unit.

{¶ 10} On cross-examination, Wauford acknowledged that appellant consented to a search of the house. He also testified that appellant mentioned that Molnar used drugs and appellant thought Molnar had overdosed on drugs.

{¶ 11} The state next played a videotaped deposition of retired Toledo Police Detective Chad Culpert. Culpert was the person who photographed the crime scene, and he authenticated many of the pictures of the home and the victim that were entered into evidence. Culpert also testified that he recovered a ball-peen hammer, a wire hanger, and a cell phone from the house. Culpert further collected two blood swabs from a blood

5.

smear that was on the doorframe of one of the rooms. Finally, Culpert testified that he collected some letters that were on the kitchen floor, and two prescription pill bottles that had been filled in Molnar's name.

{¶ 12} The next witness to testify was Dr. Robert Forney, the chief toxicologist in the Lucas County Coroner's office. Forney testified as an expert witness that Molnar experienced acute cocaine intoxication at the time of her death.

{¶ 13} Dr. Maneesha Pandy, a deputy coroner in the Lucas County Coroner's office, testified next. Pandy testified that when she examined Molnar, she noticed multiple blunt force trauma and extensive injuries on Molnar's body. Pandy testified that the multiple bruises were "recent" and could have been made by any flat instrument, agreeing with the prosecution that they could have been made with a ball-peen hammer. Pandy also identified curved, line-like marks mainly on the left side of Molnar's body as well as her back. Pandy testified that the line marks were "recent," and could have been made by something like a wire hangar. In addition, Pandy testified to the marks on Molnar's face, and noticed scalding on her forehead, nose, and right cheek, with some scalding marks on her left cheek. Pandy testified that this indicated a pour pattern, where the water struck Molnar's forehead first and then ran down the face. Pandy described that the force of the water was strong enough that it would have caused splashing, and indicated that water released from the drain valve of a hot water heater would have been sufficient to cause the injuries.

6.

{¶ 14} Pandy next testified regarding Molnar's internal injuries. Pandy documented a laceration of the spleen and left kidney, as well as bruising to the pancreas and ribs. Pandy further found approximately one-liter of blood in Molnar's abdominal cavity, which Pandy testified could have been fatal, and could have caused death within minutes or hours. Pandy also testified that Molnar suffered bleeding in the brain from recent injuries to her head.

{¶ 15} Pandy then concluded—in her expert opinion and to a reasonable degree of medical certainty—that Molnar died from multiple blunt force trauma. Further, Pandy concluded that the ingestion of drugs played no role in Molnar's death.

{¶ 16} The state then presented photographs of Molnar's injuries with a digitally manipulated wire hanger super-imposed over the injuries. Pandy testified that the curvy, line-like injuries could be consistent with Molnar being struck by a bent wire hanger. Further, the state introduced a picture of appellant's hand, which had a wound in the center of the palm. Pandy testified that the wound could be consistent with holding the end of the hangar and repeatedly hitting something with it. Likewise, the state introduced pictures of some of Molnar's injuries with a ball-peen hammer super-imposed on them. Pandy testified that some of those injuries could have been caused by a ball-peen hammer, and that being struck with a ball-peen hammer could lead to injuries like the lacerated kidney that Molnar sustained.

{¶ 17} The state next called retired Toledo Police Detective James Scott. Scott testified that he arrived at the scene of the crime on June 8, 2011, and spoke briefly with

7.

appellant. Scott then invited appellant downtown for an interview, and appellant agreed. Scott described in general terms that during the interview appellant claimed that when he woke up on June 8, 2011, Molnar had already left the house. Appellant then left, and when he returned later that day, he found Molnar in the basement. Scott testified that appellant tried to act like he did not notice any marks on Molnar's body, and that appellant tried to blame everything on Molnar falling down because she was high on drugs. Scott then took pictures of appellant's right hand, which had a wound in the middle of his palm. Scott also examined appellant's body, but did not notice any other scratch marks or injuries.

{¶ 18} Scott also testified that he spoke with Molnar's mother, and received a letter that appellant sent to Molnar in February 2011, while he was in prison. The letter was read into the record, and it contained numerous threats to Molnar and her family because appellant believed that Molnar had stolen some money and property from him. Appellant wanted Molnar to return the money and the property, and if she did, he would let her survive.

{¶ 19} The state then played two interviews between Scott and appellant, conducted in the early morning hours of June 9, 2011. In the interviews, appellant explained that he picked Molnar up around 8:00 p.m. on June 7, 2011. Eventually, they went back home and fell asleep on the blow-up air mattress on the first floor of the house. Appellant said that Molnar woke up at 3:30 in the morning and went upstairs to use the bathroom and fell down the stairs. He said that Molnar had taken too much Xanax and

8.

her legs were wobbly. Appellant stated that the two were up until 10:00 a.m., at which time Molnar said she was going to leave the house and appellant went back to sleep. Appellant then woke up between 12:00 and 1:00 p.m., and went to a nearby carryout to get something to smoke. Appellant said that he thought at the time that Molnar had already left the house.

{¶ 20} After getting something to smoke, appellant said he went to his friend's house for a minute, then went over to another woman's house and had sex with her. Appellant said her name was Janie, but he did not know her last name. Appellant said he left Janie's house around 3:00 p.m. Appellant said he then drove by Molnar's parent's house, looking for Molnar. After driving around for a little while, appellant stopped and talked to another friend, Jodi. Eventually, appellant returned to his house at around 7:30-7:50 p.m.

{¶ 21} Appellant stated that when he returned home he went to turn the water on to get something to drink, but the water would not turn on. Appellant then went to the basement to check on the water, and that is when he found Molnar. Appellant thought she was strung out on drugs, so he picked her up and put her on a mattress that was in the basement, and was trying to shake her and get her to wake up. Appellant stated that the water was coming out of the hot water heater, but the water must have been draining for a while because the water was cold. When appellant tried to stop the flow, he accidentally opened the plug all of the way and could not get the water to stop. Appellant explained that he keeps the hot water heater turned all the way up, but Molnar did not like that, so

9.

she would turn the hot water heater down. Appellant presumed that must have been the reason why Molnar went to the basement.

{¶ 22} Appellant then picked Molnar up and carried her upstairs. Appellant said he thought Molnar was just unconscious, and recounted that she had overdosed on drugs before and had been unconscious for two days. Appellant claimed that it did not enter his mind at that time that she could be dead. Appellant next called his mother, who told him to call 9-1-1. Appellant did not want to call 9-1-1 because he did not want Molnar to get in trouble for being on drugs. However, eventually, appellant did call 9-1-1.

{¶ 23} The interview then turned to the marks on Molnar's body. Appellant claimed that the marks were the result of Molnar stumbling and falling. Appellant repeatedly denied causing the marks on Molnar's body. Appellant further denied even seeing the "whip marks" on Molnar's body.

{¶ 24} The state next called Mark Oliver as a witness. Oliver is the handyman who installed the hot water heater located at appellant's home. Oliver testified that it was a newer hot water heater, and did not have any known issues at the time. Oliver also testified that if the water was not shut off and the drain plug was opened, water would continue to flow out of the hot water heater at a rate similar to an outside faucet on a house. Finally, Oliver testified that if the drain plug had been opened, the rest of the house would still have relatively normal water pressure.

10.

{¶ 25} Jane Henneman testified next for the state. Henneman testified that she knew appellant and had sex with him on June 8, 2011. Henneman stated that appellant was at her house for several hours, which was unusual for him.

{¶ 26} The next witness was Sandra Smith, who testified over the objection of appellant. Smith was a bartender on December 8, 2009, when a young, petite lady burst through the door of the bar, crying hysterically and saying that she had been held captive and had gotten away from someone. She begged Smith to not let the person in the bar. Smith hid the young lady behind the bar and called 9-1-1, and two men barricaded the door. Nobody attempted to come into the bar. Smith described the lady as "beat up," and "a hot mess," and remarked that she appeared terrified. On cross-examination, Smith testified that the lady said it was her boyfriend who was chasing her.

{¶ 27} Following Smith, Jeff Molnar, the victim's brother, testified over the objection of appellant. Jeff testified that by 2009 Molnar had been dating appellant for a year or two. He testified that once Molnar began seeing appellant, everything in her life began going downhill; she began using drugs, lost her job, and would disappear for extended periods of time. Jeff stated that whenever he did see Molnar, she would have bruising on her body and arms, and periodically she would have a black eye. Jeff testified that in December 2009, Molnar was hospitalized in the intensive care unit because she had been severely beaten and assaulted. Molnar conveyed to Jeff at the time that she was fearful of appellant. Further, she told Jeff that she stayed in a relationship

11.

with appellant because she feared for the safety of her family and her son if she did not continue that relationship.

{¶ 28} Jeff next testified that on the evening of June 8, 2011, he had returned home from work at around 4:00 p.m. He then went outside and was in the yard, and later went with his wife to Kohl's. Jeff testified that during this time, he saw appellant drive by three or four times, which was unusual because he had never seen appellant around so much.

{¶ 29} Jeff then read a letter from Molnar to appellant, which was received on February 21, 2011. In the letter, Molnar criticized appellant for having sex with several different women. She also told him that she was afraid of him, and recounted how appellant had hit her, been physical with her, and given her multiple bruises.

{¶ 30} On cross-examination, Jeff acknowledged that Molnar and appellant had periods of time where they got along and did things together with their respective children. Jeff conceded that it would be safe to conclude that Molnar cared for appellant.

{¶ 31} The state next called Kelly Parks as a witness over the objection of appellant. Parks was an emergency room nurse at Bay Park Hospital on December 8, 2009, and was the first nurse to examine Molnar on that night. Parks recorded that Molnar stated that she had been assaulted by her live-in boyfriend, that he made her use cocaine, that she was able to escape and run to a bar for help, and that she complained of pain all over her body. Parks testified that Molnar had multiple marks on her body, and

12.

specifically bruising to her arms and face. Molnar described that she had been beaten with a broom multiple times, and had been punched all over.

{¶ 32} Parks described the injuries as: bruising to the left and right temporal areas, a two centimeter abrasion to the scalp at the hairline, bruising to the left and right upper and lower eyelid, a purple circular bruise on the right hip with a five to six centimeter linear bruise that Molnar said was caused by being hit with the broom, and bruising to her left and right upper thigh. Parks then identified photographs taken during an examination of Molnar, and further described bruising to Molnar's ears and jaw. In addition, the photographs depicted a linear bruise on Molnar's upper left arm that appeared to be consistent with being struck by a broom. Other bruises caused by a blunt object were found on Molnar's elbows and knees. Parks also testified that a CT scan revealed that Molnar had bruising on her spleen, and an older rib fracture on her left side. According to Parks, Molnar stated during the examination that she was held with an extension cord around her neck, and that appellant forced her to do a line of cocaine to help her pain. The toxicology report showed that Molnar tested positive for marijuana, cocaine, benzodiazepines, which include drugs like Xanax, and opiates, which include drugs like heroin and Percocet.

{¶ 33} On cross-examination, Parks acknowledged that she sees patients who have suffered similar injuries approximately once per week. Parks agreed that there is nothing particularly unique about the bruises and abrasions that appeared on Molnar's body

compared to bruises and abrasions that Parks has seen on other patients' bodies. However, on redirect, Parks testified that the sheer number of bruises was unique.

{¶ 34} The next witness to testify, over appellant's objection, was R.B. R.B. began dating appellant in 2012, and is the mother of his two daughters. At the outset of her testimony, R.B. expressed her extreme displeasure in being forced to testify. Nonetheless, the state questioned R.B. over two incidents, the first of which occurred on November 23, 2013. The state presented R.B. with a copy of a police report from the incident in which R.B. claims that she was assaulted by appellant. Photographs included with the report show that R.B. had bruising to her face and a bloody mouth. The photographs also showed linear bruising on her back, which appeared to be consistent with R.B.'s statement in the report that appellant had hit her with a belt. However, while on the stand, R.B. disavowed the police report, claiming that her father made her fill it out because he did not like appellant. R.B. explained that the injuries actually occurred during a fight between her and another woman. R.B. was unable to explain the marks on her back other than to say that they occurred while she was rolling around on the ground during the fight.

{¶ 35} The second incident occurred on June 27, 2014. In the police report, R.B. stated that appellant choked her and placed a lit cigarette against her neck. On the stand, however, R.B. dismissed the report, stating that she was "very heavily on drugs" during that time. She testified that she did not recall appellant choking her, but she did remember that he threw a cigarette at her that hit and burned her neck. R.B. was then

14.

shown pictures that were taken at the time.  She disagreed with the state that the pictures showed her having a black eye and a busted lip.

{¶ 36} Finally, R.B. authenticated four letters that were sent from appellant to her.

{¶ 37} The state next called Toledo Police Officer Richard Trevino over appellant's objection.  Trevino testified that on the night of December 8, 2009, he received a call of a possible abduction and assault.  Trevino responded to the bar where Molnar was located.  He testified that Molnar's hair was disheveled, that she had some blood on her arms and face, and that she had bruises on her arms and legs.  Trevino spoke with Molnar, who told him that on December 7, 2009, appellant accused her of taking his drugs.  Appellant then started hitting her, and would not let her leave the apartment until she gave him the drugs.  Appellant kept her overnight, and then on December 8, 2009, they got into another argument.  Molnar told Trevino that appellant began hitting her again, and when she tried to leave, he stripped all of her clothes off of her until she gave him back the drugs.  Molnar further told Trevino that appellant hit her with a broom during this time.

{¶ 38} On cross-examination, Trevino acknowledged that in his 24 years of law enforcement he has seen a number of victims with similar injuries.  Some of the victims had more bruises, and some had less.  Trevino testified that it was the similarities of Molnar's injuries to other victims' injuries that led him to conclude that it was a domestic violence matter.

15.

{¶ 39} The next witness to testify was Sheri Marshall. Marshall has known appellant for 20 years, and at times had a romantic relationship with him. Marshall testified that she knew Molnar, and knew that Molnar was appellant's girlfriend. On the night of June 7, 2011, appellant called Marshall and asked her to come over to clean his house because it was a mess. When Marshall arrived, she found broken glass all over the dining room, and a mess in the kitchen. She testified that she saw Molnar lying on a couch in the living room. Marshall described that Molnar "looked retarded." According to Marshall, Molnar could not talk or sit up. Marshall asked to take Molnar to the hospital, but appellant did not want to, stating that Molnar would be all right and that she had been like that before.

{¶ 40} Marshall then testified that she found out the next day that Molnar had died. Marshall stated that she attempted to go to Molnar's funeral with appellant, and that appellant told her he wanted to go to the funeral "to make it look good."

{¶ 41} On cross-examination, Marshall clarified that she was not certain of the date that she went to clean appellant's house, but knew that she arrived between 7:00 and 8:00 p.m. and stayed for approximately an hour. She testified that she also knew that Molnar died later that night. Marshall explained that she returned to appellant's house the next day to retrieve her car, but appellant was not home, and one of the news stations was there and tried to interview her.

{¶ 42} Marshall also testified on cross-examination that she was sure that Molnar was laying on a black, L-shaped couch that was in the living room. Marshall testified

16.

that in front of the couch was an air mattress, which was where appellant and Molnar would sleep. Marshall was then shown a crime-scene picture of Molnar's body lying on the air mattress. Marshall identified where the couch would have been in the photograph, but commented that the couch was no longer there.

{¶ 43} The state next called, as an expert witness, Emily Miller, a forensic scientist at the Bureau of Criminal Identification ("BCI"). Miller testified that she swabbed various items of evidence from the crime scene, in an effort to search for bodily fluids. In particular, Miller found that the ball-peen hammer tested presumptively positive for blood, and that the swab from the bathroom doorway tested presumptively positive for blood. In contrast, Miller found that the wire hanger did not test positive for any bodily fluids. Miller testified that she also collected Molnar's fingernail clippings for further testing.

{¶ 44} Sara DeVine testified next as an expert witness for the state. DeVine is a forensic scientist in the biology and DNA sections of BCI. DeVine testified that swabs taken from the handle of the ball-peen hammer returned with a major DNA profile matching appellant's. Similarly, the swab taken from the bathroom doorway contained a major DNA profile matching appellant's. Molnar was excluded as a major contributor in both cases, and there was insufficient data to make a comparison with any other DNA contained in the mixtures. Further, DeVine testified that swabs taken from the hanger did not have enough DNA to make a comparison. As to the fingernail clippings, the right fingernail clippings contained no DNA foreign to Molnar. The left fingernail clippings

17.

contained a mixture of DNA, of which Molnar was the major contributor, but there was insufficient DNA to make any further comparisons.

{¶ 45} On cross-examination, DeVine testified that swabs from the head of the ball-peen hammer revealed a mixture of DNA that was not sufficient for comparison.

{¶ 46} The next witness to testify as an expert for the state was Timothy Augsbach, a forensic scientist in the DNA section of BCI. Augsbach performed a Y-STR DNA test on Molnar's right fingernails, which revealed a DNA profile from which appellant could not be excluded. Augsbach testified that the likelihood of finding a similar DNA profile was 1 in every 394 males.

{¶ 47} The state next called Emily Feldenkris as an expert witness. Feldenkris was also a forensic scientist in the DNA section of BCI. Feldenkris testified that she performed a DNA analysis on vaginal swabs that were taken from Molnar on December 22, 2009. The results of those swabs indicated a mixture of DNA from Molnar and appellant. It was further revealed that the existence of appellant's DNA indicated a recent event—within 24 hours prior to the swab being taken.

{¶ 48} Toledo Police Detective James Dec testified next. Dec performed the data analysis on Molnar's cell phone that was recovered from the house by Detective Culpert. Dec testified that it was an older "dumb" phone, and thus only retained 128 incoming text messages and 128 outgoing text messages. When those amounts were exceeded, the oldest messages would be deleted automatically and replaced by the newest messages.

18.

{¶ 49} Dec testified that between late April and early June 2011, there were over 100 incoming and outgoing messages between Molnar and appellant. Dec noticed, however, that between late May and June 6, 2011, there were approximately 30 outgoing messages from Molnar's phone to appellant, but no incoming messages from appellant. Dec testified that from a review of the outgoing messages, it appeared as if Molnar and appellant were having a conversation. Dec concluded that the incoming messages from appellant during this time had been manually deleted. Both parties then highlighted particular text messages near the date of Molnar's death, which revealed a relationship that oscillated between concerns and allegations of violence, and statements of desire and affection.

{¶ 50} Following Dec's testimony, the state called Rebecca Barrett, a forensic scientist at BCI, to testify as an expert witness in questioned documents examination. Barrett testified to a reasonable degree of professional certainty that a February 15, 2011 letter addressed to Molnar—and originally introduced into evidence through Detective James Scott—was written by appellant. Barrett reached this conclusion by first comparing the letter to a requested writing exemplar obtained from appellant. From the writing exemplar, Barrett was unable to identify appellant as the author of the February 15, 2011 letter. However, she testified that the writing exemplar contained several instances of "unnatural writing." When Barrett was further provided with other letters that were known to have been written by appellant, Barrett was then able to conclusively determine that appellant was the author of the February 15, 2011 letter.

19.

{¶ 51} The final witness called by the state was retired Toledo Police Detective William "Jay" Gast. In addition to testifying regarding the investigative steps that he took, Gast testified about an anonymous Crime Stopper report that was received on June 11, 2011, which indicated that Molnar may have provided information to the police that led to a raid on a drug dealer named "Jamaica." Gast testified that he was unable to identify who "Jamaica" was, but that he was familiar with a drug dealer in that area named "Jamocha." Jamocha, however, was excluded as a suspect because he was in prison at the time of Molnar's death.

{¶ 52} Gast next authenticated an interview that he conducted with appellant on November 16, 2016, which was then played for the jury. In the interview, appellant was again questioned on the circumstances of the June 8, 2011 death of Molnar. Appellant was also questioned about the 2009 incident wherein Molnar suffered significant injuries that she identified were caused by appellant. Following that video, the state next played a recorded interview from another interview conducted on January 20, 2017, immediately after the grand jury indicted appellant for murder.

{¶ 53} Following Gast's testimony, the state rested. Appellant then moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. The parties then gave their closing arguments and the trial court instructed the jury. After deliberations, the jury returned with a verdict of guilty as to both the count of aggravated murder and the count of murder.

20.

{¶ 54} The trial court proceeded immediately to sentencing. The court found that the two counts were allied offenses of similar import, and the state elected to proceed with sentencing on the count of aggravated murder. The trial court then imposed a sentence of life in prison without the possibility of parole.

## II. Assignments of Error

{¶ 55} Appellant has timely appealed his judgment of conviction, and now asserts six errors for our review:

1. The trial court abused its discretion by allowing other acts evidence into the record.

2. The trial court abused its discretion by instructing the jury that both affirmative actions and a failure to act constitute purpose or intent after they asked for instructions concerning deadlock.

3. Appellant's convictions for aggravated murder and murder were based on insufficient evidence.

4. Appellant's convictions for aggravated murder and murder were against the manifest weight of the evidence.

5. The trial court abused its discretion by removing the first appointed counsel without consulting appellant.

6. Cumulative error deprived appellant of a fair trial.

## III. Analysis

## A. Other-Acts Evidence

{¶ 56} In his first assignment of error, appellant argues that the trial court erred when it admitted other-acts evidence of the December 2009 assault of Molnar and the November 2013 and June 2014 assaults of R.B.

{¶ 57} In reviewing this issue, we note that "[t]he trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." *State v. Lowe*, 69 Ohio St.3d 527, 532, 634 N.E.2d 616 (1994). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 58} The Ohio Supreme Court has identified a three-step test to determine if other-acts evidence is admissible.

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts

evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403.

*State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. This appeal will focus on the second step.

{¶ 59} "Evidence of other acts is admissible if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Lowe* at 530; Evid.R. 404(B); R.C. 2945.59. Here, the other-acts evidence was entered to prove identity.

Other acts can be evidence of identity in two types of situations. First are those situations where other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment," and which are "inextricably related to the alleged criminal act." *State v. Curry* (1975), 43 Ohio St.2d 66, 73, 72 O.O.2d 37, 41, 330 N.E.2d 720, 725. * * *

Other acts may also prove identity by establishing a *modus operandi* applicable to the crime with which a defendant is charged. * * * "'Other acts' may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged

offense." *State v. Smith* (1990), 49 Ohio St.3d 137, 141, 551 N.E.2d 190, 194.

*Lowe* at 531. In this case, the other-acts evidence is not part of the immediate background of the alleged act, but instead is being offered to show that appellant has a particular modus operandi.

{¶ 60} "A certain *modus operandi*, is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator." *Id.* "To be admissible to prove identity through a certain *modus operandi*, other-acts evidence must be related to and share common features with the crime in question." *Id.* "The standard for admissibility of other-acts evidence is strict." *Id.* at 533.

{¶ 61} In *Lowe*, the Ohio Supreme Court affirmed the trial court's ruling that certain other-acts evidence was inadmissible. In that case, the victim was found dead from multiple stab wounds. In addition, a responding officer was found shot to death, possibly with his own revolver. The victim's body was partially clad in only a shirt, her feet bound with rope, and her hands bound with a cloth. *Id.* at 527. The state theorized that the defendant planned to have sex with the victim, which went awry, resulting in the murders. Notably, the murder scene contained no direct evidence which indicated that the killing was sexually motivated. It was undisputed that the attacker surprised the victim after she had quickly emerged from the shower to answer the telephone, and the

24.

victim's body was not sexually mutilated. A key piece of evidence in that case was a handwritten document known as the "power list," which the state characterized as a written plan of deviant sexual activity. Named on the list were the victim and her minor daughter, as well as two other female children who were eight years old, among others. The state sought to introduce the testimony of the two other female children.

{¶ 62} The children testified that they would occasionally visit the defendant's home, and would play several different games, including the "rug game," in which the defendant would wrap the children up in a rug, tie a rope around one end, and drag them around the floor. They would also play a variation of hide-and-seek where a person was tied and had to get loose in order to find the other players. The defendant would untie the girls if they were unable to do so themselves. Other activities with the girls were overtly sexual. The defendant, on at least one occasion, showed X-rated videotapes to the girls while having his hands down his pants. On another occasion, the defendant would walk through his house in bikini underwear, with his hands down his pants. The defendant also showed the girls Playboy magazines and allowed the girls to make audiotapes of themselves uttering sexual language. However, there was no testimony that the defendant ever touched the girls in a manner which constituted sexual contact.

{¶ 63} The trial court ultimately found that the other acts-evidence was inadmissible. On appeal, the Supreme Court of Ohio affirmed. The court reasoned that the defendant's activities with the girls did not establish a modus operandi. The court noted that the defendant acted in a completely nonviolent manner with the girls, the

activities occurred in his own home, he did not stalk the girls, and there was no element of surprise or force with the girls.  In contrast, the killer surprised the victim in her own home, and violently stabbed her in the chest repeatedly and slashed her throat.  Further, there was no direct evidence that the attack was sexually motivated.  Finally, although rope was used in both instances, the Supreme Court determined that the use of rope itself does not provide a distinctive behavioral fingerprint.  Therefore, the court held that the trial court did not abuse its discretion when it found the other-acts evidence inadmissible. *Id.* at 533.

{¶ 64} In reaching its decision in *Lowe*, the Supreme Court of Ohio compared the facts before it to several other cases in which the court had found that the evidence did establish a behavioral fingerprint.

{¶ 65} In *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), the Supreme Court held that evidence from seven other robberies was admissible in a murder trial where the victim was working at a bar during the day in downtown Cincinnati when a robber entered, took money from the cash register, and struck the victim in the head, ultimately causing the victim's death.  In that case, the other robberies all occurred within a four-month period, in the general downtown area of Cincinnati, on weekday afternoons (with one exception), and from first-floor, on-the-street, walk-in businesses.  In addition, in all of the other robberies appellant physically took or attempted to take money from the register, forced, threw, or knocked victims to the floor, and consistently directed

26.

violence to a victim's head by either striking the head causing severe head injuries, pulling hair, or holding a gun to the head. *Id.* at 184-185.

{¶ 66} In *State v. Smith*, 49 Ohio St.3d 137, 551 N.E.2d 190 (1990), the defendant was tried in two different courts with two different murders. In each trial, evidence of the other murder was admitted. Appellant was convicted of both murders. On appeal, two separate courts of appeals reversed the convictions, respectively. The Supreme Court jointly reversed the decisions of the courts of appeals and affirmed the trial courts' admission of other acts evidence to prove the identity of the defendant as the supplier of a fatal dose of heroin to the two separate victims. The court described the similarity between the two murders as follows:

> Both victims were friends of the defendant. Both victims were overnight guests of defendant at his trailer. Both victims were frequent drug users. Defendant waited one or more hours in both instances before calling the police. Defendant cleaned the trailer both times to remove any incriminating evidence. In both instances, defendant met the officers at his trailer and told them that the victims had apparently died of an overdose of illegal drugs. Both victims died of acute morphine intoxication, having .07 milligrams percent of morphine in their blood.

*Id.* at 141.

27.

{¶ 67} Finally, in *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988), the Supreme Court affirmed the trial court's admission of other-acts evidence regarding attempted abductions and rapes. The court reasoned,

> All three incidents occurred within a few months of each other, within a few miles of each other, and all involved young girls between the ages of eleven and fourteen walking along a street after dark. The method in all three incidents was identical: a lone driver in a car passed the victims, parked the car and then attacked them from behind, trying to get the victims into the car while using the same scurrilous language. Two of the incidents involved the same car and a knife.

*Id.* at 282.

{¶ 68} Here, we find that the other incidents introduced at appellant's trial do not contain the same distinctive characteristics that would rise to the level of a behavioral fingerprint. In each instance, appellant beat his romantic interest. Tragically, however, domestic violence is not a characteristic unique to appellant such that it can establish a behavioral fingerprint. As noted by Parks and Trevino, the types of bruises and abrasions on Molnar's body were similar to bruises and abrasions frequently seen on domestic violence victims.

{¶ 69} As to the November 2013 and June 2014 assaults of R.B., the characteristics of those assaults are markedly different from the June 8, 2011 murder of Molnar. Molnar's beating was pervasive, and involved being struck by a blunt

instrument to the point of suffering fatal internal injuries. In comparison, the assaults on R.B. were not nearly as pervasive, involving only bruising to the face, and a belt mark on her back.

{¶ 70} As to the December 2009 assault of Molnar, the facts are closer. In both instances, Molnar suffered significant bruising all over her body. However, the June 8, 2011 incident differs in both the type and severity of the injuries. In December 2009, Molnar was struck repeatedly with a broom, which caused bruising on her arms and legs, as well as a bruised spleen. On June 8, 2011, Molnar was allegedly beaten with a ball-peen hammer, and suffered not only bruising on her arms and legs, but also a lacerated spleen and left kidney, bruising to her pancreas and ribs, and bleeding in the brain. In addition, unique to the June 8, 2011 incident, Molnar had numerous linear marks on her body, which suggested that she was whipped with some type of object, as well as scalding marks on her face.

{¶ 71} Moreover, the circumstances surrounding the two assaults differ in material ways. While in both instances Molnar tested positive for cocaine, in December 2009, Molnar also tested positive for marijuana, benzodiazepines, and opiates. Further, in December 2009, Molnar alleged that appellant kidnapped her and held her hostage, but there is no evidence to suggest that Molnar was being held against her will in June 2011. Finally, although not presented to the jury, in December 2009, Molnar alleged that she was the victim of a sexual assault, but there was no evidence that Molnar suffered a sexual assault in June 2011.

29.

**{¶ 72}** Therefore, we hold that the other-acts evidence in this case does not meet the strict threshold of establishing a modus operandi to prove appellant's identity as permitted under Evid.R. 404(B), and instead constituted impermissible evidence as to appellant's character and propensity to act in conformity with the other acts. Consequently, we hold that the trial court abused its discretion in allowing the other-acts evidence of the December 2009 assault of Molnar, and the November 2013 and June 2014 assaults of R.B.

**{¶ 73}** Next, we must determine if the improper admission of the other-acts evidence has prejudiced appellant. "The question is whether an improper admission affects the defendant's 'substantial rights' so that a new trial is required as a remedy." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 26. If not, the error may be disregarded as harmless error. *Id.* at ¶ 25. Importantly, we must find that the error was harmless beyond a reasonable doubt. *Id.* at ¶ 28. In determining whether an error is harmless beyond a reasonable doubt, we "must excise the improper evidence from the record and then look to the remaining evidence." *Id.* at ¶ 29. "[T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *Id.*, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986).

**{¶ 74}** In this case, excluding the other-acts evidence, the remaining evidence against appellant, while strong, is entirely circumstantial. There is no direct physical or witness testimony that establishes that appellant murdered Molnar. Furthermore, a

30.

significant portion of the trial was comprised of the other-acts evidence and involved the testimony of multiple witnesses. Therefore, we find that the admission of the other-acts evidence was not harmless beyond a reasonable doubt.

{¶ 75} Accordingly, appellant's first assignment of error is well-taken.

## B. Other Assignments of Error are Moot

{¶ 76} In light of our resolution of appellant's first assignment of error, which warrants a new trial, appellant's second, fourth, fifth, and sixth assignments of error are moot.

{¶ 77} Accordingly, appellant's second, fourth, fifth, and sixth assignments of error are not well-taken.

## C. Sufficiency of the Evidence

{¶ 78} In his third assignment of error, appellant argues that his conviction was based upon insufficient evidence. Because "the state is not entitled to retry a criminal defendant after reversal for trial court error if the state failed in the first instance to present sufficient evidence * * * a defendant's assigned error that the conviction is based on insufficient evidence is not moot under these circumstances." *State v. Vanni*, 182 Ohio App.3d 505, 2009-Ohio-2295, 913 N.E.2d 985, ¶ 15 (9th Dist.), citing *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284.

{¶ 79} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

31.

doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 80} Appellant was convicted of aggravated murder under R.C. 2903.01(A), which provides, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. Three factors are traditionally considered in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Id.* at ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001). Evidence of prior calculation and design includes facts which demonstrate that appellant's conduct "went beyond a momentary impulse and show that he was determined to complete a specific course of action." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 46.

32.

{¶ 81} Here, when viewed in a light most favorable to the state, the evidence could lead a jury to conclude that appellant purposely, and with prior calculation and design, beat Molnar to death. Appellant was the only person with Molnar around the time of her death. Appellant had previously beaten Molnar before, requiring her to spend time in the hospital. Sheri Marshall testified that either the night before or the night of Molnar's death, she saw Molnar in appellant's house, and Molnar could not sit up or speak, and could not even take a sip of water. A ball-peen hammer was recovered from the scene, and the coroner testified that the injuries sustained by Molnar could have been caused by the hammer. Appellant's DNA was on the handle of the hammer.

{¶ 82} Further, appellant's explanation of how he found Molnar does not make sense. He stated that when he returned home and tried to wash himself in the kitchen that there was no water pressure. However, an open water-heater would only minimally impact the water pressure throughout the rest of the house. Also, Molnar would not need to adjust the thermostat on the hot water heater to get cooler water, she could simply have opened the cold water faucet further. Even if Molnar was going to adjust the thermostat, she would have no reason to open the drain valve.

{¶ 83} Likewise, appellant's explanation of Molnar's injuries is not credible. Appellant explained that Molnar received the injuries by falling down the stairs, but the extent of Molnar's injuries demonstrates that to be false. Appellant also could not explain the linear marks on Molnar's body, and even claimed that he did not see them, despite carrying her scantily clad body up from the basement and laying her on the air

33.

mattress. Finally, appellant claimed that he thought Molnar was still alive when he carried her up from the basement, but did not call 9-1-1 for some time, and when authorities arrived, Molnar was immediately recognized as being dead. Given the severity of the beating administered to Molnar and appellant's reluctance to call 9-1-1, a reasonable juror could infer that appellant's conduct went beyond a momentary impulse and demonstrated appellant's commitment to killing Molnar.

{¶ 84} Therefore, we hold that appellant's conviction is not based upon insufficient evidence.

{¶ 85} Accordingly, appellant's third assignment of error is not well-taken.

## IV. Conclusion

{¶ 86} For the foregoing reasons, we find that substantial justice has not been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is reversed. This matter is remanded to the trial court for further proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

_____
JUDGE

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

> This decision is subject to further editing by the Supreme Court of
> Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
> version are advised to visit the Ohio Supreme Court's web site at:
> http://www.supremecourt.ohio.gov/ROD/docs/.