[Cite as *State v. Owens*, 2025-Ohio-2035.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio

      Appellee

v.

Jacob Owens

      Appellant

Court of Appeals No. E-23-033

Trial Court No. 2021CR0258

**<u>DECISION AND JUDGMENT</u>**

Decided: June 6, 2025

* * * * *

Michael H. Stahl, Esq., for appellant.

Kevin J. Baxter and Kristin R. Palmer, for appellee.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Jacob Owens, appeals the May 17, 2023 judgment of the Erie County Court of Common Pleas which, following a jury trial convicting him of complicity to aggravated murder, murder, tampering with evidence, carrying a concealed weapon, improperly handling of a firearm in a motor vehicle, and felonious assault, sentenced him to 36 years to life in prison. For the following reasons, the judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} On June 13, 2021, at approximately 2:00 a.m., T.T. was shot and killed. Earlier that night, Owens, T.T., and several others gathered for a birthday party in Sandusky, Erie County, Ohio. On July 15, 2021, the Erie County Grand Jury returned an indictment against Owens on counts of aggravated murder and murder, with firearm specifications, tampering with evidence, carrying a concealed weapon, improperly handling a firearm in a motor vehicle, aggravated riot, felonious assault, and having a weapon while under a disability.[1] Owens entered not guilty pleas as to all counts. On April 13, 2023, the State dismissed the aggravated riot charge.

{¶ 3} The case proceeded to a jury trial, during which J.K. testified that on June 12, 2021, he attended a party hosted by C.S. at her home in Sandusky, Ohio. Approximately 16-17 people attended. J.K. and C.S. were "playin' around" in the kitchen and he spilled a drink. Owens told him to clean it up and to "[d]o that shit right now." J.K. stated that Owens then threatened to beat him up.

{¶ 4} Eventually, everyone went outside to fight. J.K. testified that Tim Hill arrived by car with K.K., his girlfriend. When Hill and T.T. began fighting, J.K. ran into the house to "get something." When he returned, T.T. had been shot and was lying on the ground. Owens, Hill, and others had already left. J.K. called 911.

---

[1]On August 23, 2021, with leave of court, the State filed an amended indictment correcting Owens' first name from Jacobs to Jacob.

2.

{¶ 5} On cross-examination, J.K. denied telling police that a van pulled up and gunshots were fired from inside. J.K. reiterated that during the shooting he was in the apartment.

{¶ 6} The 911 dispatcher authenticated the call received from J.K., and the State played it for the jury. The dispatcher received an additional call from a neighbor who stated that two shots had been fired.

{¶ 7} C.S. testified that on June 12, 2021, she hosted a birthday party for her friend, A.M., at her apartment on Erie Street in Sandusky, Ohio. C.S. stated that Owens attended the party.

{¶ 8} C.S. and J.K. were "smoking an FT," or mild tobacco product, in her kitchen when J.K. tried to snatch it from her hand and knocked over a cup of juice on the counter. J.K. then ran to her bedroom where several guests were located. C.S. stated that T.T. was not nearby when the juice spilled.

{¶ 9} C.S. said that as she followed J.K. into the bedroom, she kept asking him to clean up the juice. They began "play fightin." At that point Owens, D.H., and a third individual opened the bedroom door and told J.K. that he was disrespecting C.S. and her house by not cleaning up the mess. C.S. told the trio that they did not need to tell anyone what to do in her house and she shut the door on them.

{¶ 10} C.S. stated that the door reopened and the three in the hallway began arguing with those in the bedroom. The situation escalated and everyone decided to go outside and fight. Over objection, C.S. stated that someone told her that Owens

3.

threatened to shoot T.T. and that he had shot someone else. C.S. begged T.T. to stay inside because she knew that more than one of the individuals in the hallway had a gun.

{¶ 11} C.S. testified that Owens wore a ski mask, a jacket, and maybe jeans with a fanny pack worn across his chest. She saw something bulky was in his fanny pack that she believed was a gun.

{¶ 12} C.S. walked out with the group and one of the three threatened to shoot her. The individual then stated that he had a sister and he was going to have her come over to harm her. C.S. indicated that she was on house arrest at the time, and she went inside to avoid any "drama." C.S. looked outside the window and noticed a new vehicle. She went back outside and began arguing with a girl nicknamed K.K.; she then went back inside. C.S. testified that a large crowd had gathered in the alleyway next to her house.

{¶ 13} While C.S. and J.K. were cleaning up the house, they heard three gunshots. J.K. went downstairs, came halfway back up and said that T.T. had been shot. C.S. ran outside and observed a white car speeding away. C.S. sat with T.T. who was lying next to his car, breathing heavily, and not speaking. Police arrived and an ambulance took T.T. to the hospital.

{¶ 14} An hour or two after the incident, police interviewed C.S. at the station. She had her cell phone and pulled a photograph from Facebook identifying Owens and D.H. as the individuals who argued with J.K. and went outside to fight. C.S. testified that Owens lived in New Jersey before coming to Ohio.

4.

{¶ 15} C.S. acknowledged her memory during her police interview, one to two hours following the shooting, was better than during trial. She stated that she clearly remembered the most tragic parts.

{¶ 16} Sandusky Police narcotics detective, Makayla Cook, testified that on the date of the shooting she was a patrol officer and responded to the shooting. Police equipped her with a body worn camera ("BWC"). The portion of the video played at trial shows the crime scene and the victim, T.T., on the ground.

{¶ 17} Detective Cook testified that she photographed T.T.'s injuries at the hospital. The photographs depict a gunshot wound to T.T.'s lower abdomen and were shown to the jury as well as the clothing he was wearing. Defense counsel objected to the presentation of the cut-off clothing as "inflammatory" in nature; the court denied the objection. Reviewing the coroner's report (the parties stipulated to its admissibility), Cook testified that the gunshot wound was fatal and that the manner of T.T.'s death was homicide.

{¶ 18} Sandusky Police Detective Eric Costante testified that he was called to the shooting scene to collect evidence. Video from his BWC was played for the jury and shows police collecting a 9-millimeter shell casing and a live 22 caliber bullet. After Costante photographed the shell casing, it was packaged and sent to the Toledo Police Department for further analysis.

5.

{¶ 19} Detective Costante testified regarding "some blood or stomach matter" photographed in the roadway near the crime scene. During the course of the investigation, police determined that it was vomit that came from Tim Hill.

{¶ 20} After processing the Erie Street crime scene and interviewing C.S., Detective Costante and other officers proceeded to an apartment rented to Dana Dreyer on Pioneer Trail, in Sandusky, Ohio where they arrested Hill, D.H., and Owens. D.H. admitted to discharging a firearm into the air at the crime scene.

{¶ 21} Prior to their arrests, outside the apartment police stopped a Dodge Journey believing that Owens was inside. The occupants were Jose Rosario and Shanya Durham. Police determined that Dreyer owned the vehicle, and that Dreyer picked up D.H. and Owens from the crime scene. Costante testified regarding photographs depicting a front passenger seat cushion "hidden" storage compartment that police overlooked during the initial search of the vehicle. Later in the investigation, police opened the compartment which contained a cloth object or towel.

{¶ 22} During a sidebar, the trial court, sua sponte, revisited the overruled objection during C.S.'s testimony. The court stated:

> COURT: There was a statement that I think [C.S.] said that somebody told her that somebody said he was going to kill –
> MS. LILLY: Uh huh.
> COURT: -- someone. I believe in the open – I denied the objection on hearsay because I believe in the opening there was a statement that some people actually heard it, and I assume that they are coming in to testify, those people that heard that, that's the reason I overruled the objection.
> . . .
> MS. LILLY: . . . her interview with Detective Costante based upon her, what I believe I've established as it would be an excited utterance, the

6.

confrontation clause would not be violated. She was here and subject to cross-examination and her demeanor during the interview, I'm going to be asking that the interview be played wherein she says in that interview that the Defendant said to – she reported to the detective that on several occasions she personally heard the Defendant threaten to shoot [T.T.] –

. . .

-- and that he also indicated during that time period that he had shot somebody else previously.

{¶ 23} The parties ultimately determined that the conflicting statements in C.S.'s trial testimony and recorded interview were credibility issues. Defense counsel maintained his objection to the "shot somebody else" statement under Evid.R. 404(B).

{¶ 24} The State then played the recording of Detective Costante's interview of C.S. During the interview, C.S. spoke of the "boys from New Jersey," who always wanted to fight and talked about shooting people. C.S. said that Owens told her he was in Sandusky because he shot someone in New Jersey.

{¶ 25} C.S. stated that shortly before the shooting she and J.K. were playing around and he spilled some juice in the kitchen. Owens admonished him and told him to clean it up. T.T. retorted telling Owens not to talk to his "brother" that way. C.S. said that Owens told T.T. to "shut the fuck up before I shoot you." The parties began talking about going outside to fight. C.S. believed the New Jersey men were dangerous and therefore she tried to prevent T.T. from going outside.

{¶ 26} C.S. stated that outside her apartment, there were about 20 males pushing and shoving each other. A car pulled up and people exited the vehicle and started fighting. After the group quieted down, C.S. was inside when she heard two or three

7.

gunshots. J.K. looked out the window and Correon Martin, who was outside, started yelling that T.T. had been shot. C.S. stated that she thought it was Owens and D.H.'s ride that arrived immediately prior to shots being fired; she then heard screeching tires.

{¶ 27} During redirect examination, Detective Costante testified that the ballistics report comparing the 9-millimeter shell casing found at the scene with a casing collected from Owens' .40 caliber ghost Glock were found to be a match. He explained that cartridges are like a fingerprint, unique to the particular gun.

{¶ 28} Detective Costante testified that they conducted DNA testing on the blood found at the scene. Swabs collected from the vomit were not tested because Hill stated that he threw up in the area.

{¶ 29} Penns Grove, New Jersey, Police Sergeant Jesse Thorn testified that in May 2021, he responded to a shooting call and recovered a spent shell casing. The casing went to the state police lab where it was entered into a national ballistics database. The shell casing came up as a potential match to a shell casing recovered in Sandusky, Ohio. The lab sent the casing to the Toledo Police forensics lab for a comparison analysis.

{¶ 30} Toledo Police Forensics Laboratory Senior Criminalist Kaitlyn Porter Vorst, testified by video deposition that she specializes in firearms comparison and operability. In June 2021, Sandusky police requested that Vorst conduct a comparison analysis on two test-fired shell casings and one 9-millimeter shell casing collected from the scene of a homicide. Vorst identified the tested shell casings, which were admitted into evidence.

8.

{¶ 31} Vorst stated that police test-fired a Polymer80, which is a Ghost gun, with a Glock slide. She compared the test-fired shell casings to the shell casing collected at the scene and concluded to a reasonable degree of scientific certainty that the casings came from the same weapon. Vorst provided a report reflecting her findings, which the State admitted into evidence. The casings were returned to the Sandusky Police Department.

{¶ 32} Vorst testified that in August 2022, the casings were returned to her, in the same condition they were sent, for a comparison analysis to a casing received from Penns Grove, New Jersey. Vorst stated that, as with the first analysis, she began by comparing the test-fired casings with each other. She then compared the Penns Grove shell casing with a test-fired casing and with the casing found at the scene. Vorst concluded that the Penns Grove shell casing came from the Polymer80 weapon that fired the test fires. Her written findings were admitted into evidence.

{¶ 33} Sandusky Police Detective James DeSalle testified that Jose Rosario admitted to taking the Ghost Glock gun from the apartment on Pioneer Trail, putting it in the Dodge Journey, and disposing of it in Snyder's Ditch in Bellevue, Ohio. Rosario led Detective DeSalle, Officer Orman, and Detective Cook to the precise location. That day, police located the handle, the slide, the magazine, and the spring mechanism. Two officers returned the next day and located the barrel. The items were taken to the Sandusky Police Department and held as evidence. Detective DeSalle testified that the prior night Dana Dreyer and others had stayed at the Red Roof Inn across the street from where they recovered the weapon.

9.

**{¶ 34}** Detective DeSalle testified that he reassembled the gun and performed a function test, or test fire. DeSalle successfully fired the first round but the gun subsequently jammed. DeSalle dismantled it, freed the bullet, and fired the Glock two additional times to get shell casings for the Toledo Police Department to enter into the national ballistics database during its analysis. The State admitted a video of the test fire. Detective DeSalle testified that shortly after entering the casing, Toledo Police received a correlation hit on a casing recovered from Penns Grove, New Jersey. DeSalle contacted Detective Jesse Thorn who sent the casing to the Toledo Police for a comparative analysis. Testing confirmed that the casings were all fired from the same weapon.

**{¶ 35}** Detective DeSalle testified that he received the data extracted from Owens' cell phone. DeSalle explained several exhibits depicting screen shots of group chat text messages. On May 12, 2021, Owens texted: "I just got a ghost glock." Owens' friend texted a photo of the model acquired by Owens. DeSalle then identified an actual photo, taken on May 12, with the gun in what appears to be Owens' hand. Penns Grove, New Jersey, police recovered the matching shell casing on May 21.

**{¶ 36}** The next set of text messages were dated May 22, 2021. The messages were between Hill and D.H.'s sister, Shanya Durham. Durham's messages focused on when Owens expected to leave Penns Grove. During the exchanges, Owens' location was tracked by the nearest cell phone tower it registered. Based on the cell tower and text information, Owens stopped at a rest stop in Pennsylvania; members of the Hill family picked him up and drove him back to Sandusky. Maps of the relevant cell towers

10.

in Pennsylvania, Virginia, and New Jersey and pin marks depicting the activity from Owens' phone were admitted into evidence.

{¶ 37} Two videos extracted from Owens' cell phone, dated May 31 and June 2, 2021, show him holding the Glock in a bedroom on Pioneer Trail. An early May 2021 search history including "glock" and "ghost glock" was pulled from Owens' phone. On June 2, 2021, he searched the query "ghost glock trigger not resetting." Detective DeSalle testified that the recovered Glock's trigger would not reset after his test firing.

{¶ 38} The June 13, 2021 call log from Owens' cell phone showed that beginning at 2:02 a.m., 14 minutes prior to shots being fired, Owens placed two calls to Dana Dreyer who came and picked up Owens and D.H. D.H. also called his brother, Timothy Hill, who drove to the party due to the impending fight.

{¶ 39} Early in the investigation, a theory arose that T.T. may have been the victim of a drive-by shooting. This stemmed from Correon Martin's statement when police first arrived on the scene that a car pulled up and shots were fired. Detective DeSalle testified that police ruled out this possibility after obtaining security video footage from a nearby residence showing that the only two cars coming or going were Tim Hill's and Dana Dreyer's. Further, DeSalle explained that T.T.'s injury, a through-and through gunshot wound, would have been inflicted at a closer range to clear the body. He stated that the angle of T.T.'s body and the wound's location "would have indicated it entered from the alleyway by the telephone pole." Detective DeSalle testified he conducted 15-20 interviews and that the number of people in the alleyway and

11.

between the street and where T.T. was shot made it unlikely that T.T. would have been struck by a bullet coming from the street.

{¶ 40} During cross-examination, defense counsel questioned Detective DeSalle about the location of the surveillance camera in relation to the house, alleyway, and police department (approximately one-half mile away). DeSalle stated that the camera depicted the corner of First and Erie Streets. He agreed that any vehicles further south on second or third streets would not have appeared on the video.

{¶ 41} DeSalle acknowledged that a second person took the photographs of Owens holding the Glock so at least one other person knew he had the firearm. He acknowledged that nine people lived at the two-bedroom Pioneer Trail apartment.

{¶ 42} Hill testified that his mother is Dana Dreyer, D.H. and Da.H. are his brothers, Shanya Durham is his sister, and Jose Rosario is her boyfriend. He grew up with Owens in Vineland, New Jersey. Around 2020, Hill moved to Ohio. From May to June 2021, Owens stayed with the family.

{¶ 43} Hill testified that on June 12, 2021, he and girlfriend, K.K., drove in her car to C.S.'s house. Hill stayed in the car while K.K. walked around to see who was there. They were back at her house when his brother, D.H., called and said he needed to be picked up from C.S.'s house. The houses were only about a minute apart by car. When they arrived, people were arguing, and Hill decided to try and end the fracas by physically fighting T.T. Hill stated that the fight ended after only 15 seconds because he broke his arm hitting T.T. on the head.

12.

{¶ 44} When Hill arrived at C.S.'s house, he had a 9-millimeter Taurus, that his mother had purchased, on his person. After assessing the situation, he took it back to the car. He testified that he did not observe T.T. with any type of weapon. Hill identified the Taurus in a photograph of the contents of his mother's gun safe.

{¶ 45} After the fight, Hill walked toward the sidewalk and began to feel dizzy and nauseous from the injury. He crouched or sat down by the curb and vomited; the vomit contained Cheetos which he had consumed earlier.

{¶ 46} Hill's mother arrived approximately 10 minutes after him and remained with D.H. by her car while he was ill at the curb. Hill stated that the arguing continued. He then stood up, told everyone to go, and saw Owens shoot T.T. Hill identified the Ghost Glock as the gun Owens used to shoot T.T. Hill said that when everyone scattered, D.H. fired his revolver in the air.

{¶ 47} Hill got into K.K.'s car along with D.H. and another individual. Hill said they went directly to the Pioneer Trail apartment. He returned the Taurus to his mother's gun safe. D.H. also returned his gun. Hill stated that he was already in the apartment when Owens, his mother, and two girls walked in.

{¶ 48} After about 30-45 minutes, Hill went to the hospital to get his arm treated. Shortly after returning, the police arrived and arrested him, D.H., and Owens. Hill admitted to not initially being forthcoming with police. The third time he spoke with investigators he told them that Owens shot T.T.

13.

{¶ 49} Hill admitted that he told officers what happened in exchange for leniency with the prosecutor's office. Hill stated that he had pending charges of concealed carry, rioting, tampering with evidence, and felonious assault. In exchange for his cooperation, the State agreed not to charge Hill with a gun specification. Hill agreed that he could still go to prison.

{¶ 50} During cross-examination, Hill acknowledged that he initially told police that he did not know what happened. Hill admitted that he told police that he broke his arm running from the shots that were fired. Hill stated that during the third interview he told police the truth.

{¶ 51} Hill denied going to the party to fight T.T. He stated that on the night of the shooting he had no issues with T.T. Hill stated that they both agreed to fight and end the dispute.

{¶ 52} D.H. testified that he and his family originally lived in New Jersey where he met and befriended Owens. In 2019, he and his family moved to the Pioneer Trail apartments. In May 2021, Owens moved into their apartment.

{¶ 53} D.H. went to the party at C.S.'s house with Owens and two other females, in C.S.'s car. He had his mother's revolver, which he took from her gun safe, because he did not know many people at the party. D.H. testified that he fired the weapon at the shooting range and on the night of the party. In reviewing photographs of the guns housed in his mother's safe, D.H. identified a Taurus as the gun Hill had on the night of

14.

the party. Hill would also use the gun at the shooting range. Owens had also fired the weapons at the shooting range.

{¶ 54} D.H. then identified the Ghost Glock. He stated that he previously observed the weapon at the shooting range and in Owens' possession at the party. D.H. testified that Owens had the gun tucked in his waistband at the party.

{¶ 55} D.H. stated that someone at the party broke a glass bottle and that he and Owens kept telling the person to clean up the mess. The party guests, including T.T., began arguing. D.H. pulled out his gun, aimed it in the air, and said they should go outside and fight.

{¶ 56} Before going outside, D.H. called his brother, Hill, to come and fight for him because he was too intoxicated. Hill pulled up, exited the car, walked up, and began fighting T.T. After approximately one minute the fight ended because Hill broke his arm from hitting T.T. on the head. D.H. jumped in and hit T.T. twice. He stated that the fight then broke up and the parties separated. As D.H. walked back to Hill's car he observed his mother, Dana Dreyer's black Dodge Journey.

{¶ 57} D.H. testified that Owens pulled the gun from his waistband and shot T.T. Everyone ran. D.H. fired his weapon in the air and then got into Hill's car. They went to Pioneer Trail. D.H. stated that his mom, Hill, and Hill's girlfriend, K.K., attempted to take Hill to the hospital but that police were there. D.H. stated that the group returned to the apartment, "rounded everyone up" including Owens, and unsuccessfully tried to

15.

check in to a hotel.  Shortly after they returned, the police arrived and "arrested everybody."

{¶ 58} D.H. identified Owens' fanny pack.  He also identified photos of Owens with the gun at the Pioneer Trail apartment.  D.H. stated that Owens kept the gun in his fanny pack.

{¶ 59} D.H. testified that he immediately informed police that Owens shot T.T.; he initially did not tell them that he also had a gun at the party.  He agreed that police ultimately offered some consideration for his statements.  D.H. testified that the State charged him as a juvenile and the court sentenced him to a term of incarceration at the Department of Youth Services ("DYS"); D.H. had been paroled by the date of Owens' trial.

{¶ 60} Defense counsel cross-examined D.H. regarding lies or half-truths he initially told police.  His lies included stating that only one gun had been fired, that no one else had a gun that night, and that he did not know what Owens' gun looked like.

{¶ 61} Jose Rosario testified that in June 2021, he lived with his girlfriend Shanya and her family which included mom, Dana Dreyer, her boyfriend Donte Lewis, Tim Hill, D.H., and Da.H.  In May 2021, Owens, his cousin, arrived and stayed at the apartment on Pioneer Trail.

{¶ 62} Rosario testified that initially he was not aware of the party at C.S.'s house. When Owens and D.H. left the apartment, they told him about the party.  Hill was with his girlfriend, K.K.  Rosario stayed home with his girlfriend to watch her baby sister.

16.

{¶ 63} When police arrived the next morning, Rosario and his girlfriend were in Dreyer's Dodge Journey and were heading to work. Police stopped the vehicle and had Rosario exit. They searched him, placed him under arrest, and took him to the police station.

{¶ 64} After police released Rosario, he went to stay at a motel with Dreyer, Da.H., Shanya, and Lewis in Sandusky, Ohio. When the motel owner informed them that people making threats were looking for them, the group went to a second motel in Bellevue, Ohio.

{¶ 65} Rosario testified that at the Bellevue motel, he and Lewis were cleaning Dreyer's car when he discovered the Ghost Glock wrapped in a rag in the compartment under the passenger seat. Rosario stated that after Dreyer saw the gun her "anxiety started going up" and she wanted someone to get rid of it. Rosario took the gun to a park near the motel where he followed the creek into the woods. He then dismantled the gun and threw some parts into the creek and buried others in the ground where they fell.

{¶ 66} Rosario testified that he thought someone was trying to "frame" them by putting the gun in the car. He stated that he had not previously seen the gun and did not know to whom it belonged.

{¶ 67} Rosario took police to where he disposed of the gun. The State charged him with tampering with evidence; Rosario pleaded guilty to the charge and the State agreed not to oppose a community control sanction.

17.

**{¶ 68}** The State's final witness, Detective Darian Cook, testified that in 2021, the Sandusky Police Department employed him as a detective investigating narcotics-related and violent crimes. On June 13, 2021, Cook, the on-call detective, received a call to investigate the shooting. He arrived at the scene approximately 20 minutes after the shooting. After speaking with witnesses still there, Detective Cook determined that Owens, Hill, and D.H. were persons of interest.

**{¶ 69}** Detective Cook oversaw the collection of physical evidence. Police gathered the shell casing and a necklace with a broken chain, determined to be T.T.'s, located in the alley, photographed the scene, and removed vehicles from the scene for processing. The location of the items aided police in determining where the physical altercation between Hill and T.T. took place. The shell casing narrowed the shooter's location to a six-foot radius. Reviewing crime scene photographs, Cook placed the locations of Owens, Hill, and D.H. at the time of the shooting. Detective Cook placed Hill's location at the curb just to the north by the Cheetos' vomit. Police placed D.H. closer to the shooting. Owens' location was in the same radius as the shooter's. Detective Cook testified that the bullet's trajectory, as described in the coroner's report, was consistent with their conclusions regarding T.T.'s and the shooter's location at the scene.

**{¶ 70}** Detective Cook testified that after identifying suspects Owens, Hill, and D.H., they responded to the Pioneer Trail apartment. The three were placed under arrest and with Dreyer's consent they searched the apartment. Police recovered Owens' black

18.

fanny pack containing marijuana, a magazine that fits a Glock, and Owens' state identification card and bank and health cards. Cook located and seized a nearby cell phone.

{¶ 71} The next day, Detective Cook and others canvased area businesses and homes for video surveillance cameras. Police recovered surveillance footage from a home on First Street depicting the south turn on to Erie Street. The video verified statements provided by witnesses and cell phone records regarding the timeline of the arrivals of Hill's and Dreyer's vehicles. Hill arrived at the party at 2:06 a.m.; Dreyer at 2:10 a.m.– the first 911 call came in just seconds after her arrival. Detective Cook stated that the video also ruled out the possibility of a drive by shooting because no other vehicle passed the house during the relevant timeframe. The State played the relevant portion of the video.

{¶ 72} Detective Cook stated in assessing witness credibility, police compared statements made during the police interrogations of Hill and D.H. with other information gathered during the investigation. This included the timeframes of the calls to Hill and Dreyer and their arrivals as evidenced on the surveillance video, ballistics showing that the shell casing found at the scene was shot by the Glock Owens possessed, and statements by Rosario and C.S.

{¶ 73} Over prior objection, the State asked Detective Cook to read a redacted letter to the court authored by Owens. In the letter, Owens raised a potential defense to

19.

aggravated murder. He emphasized that he based his claim only on the "totality of the investigation" and it was not a confession.

{¶ 74} During cross-examination, defense counsel questioned Detective Cook about the ejection of the shell casing from the Ghost Glock, specifically the distance it can travel. Cook acknowledged that the distance varies but that it generally exits on the right side of the firearm. During re-direct examination, Cook stated that the way a gun is held can impact the location of a shell casing and that in this case the shell casing recovered in the vicinity of T.T. came from Owens' Glock. The State then rested its case.

{¶ 75} The parties then reviewed the State's exhibits. Owens objected to the admission of photos of T.T., deceased, at the hospital. The trial court overruled the objection.

{¶ 76} Owens moved for a Crim.R. 29 acquittal on all counts, arguing that the State presented insufficient evidence of prior calculation and design to support the aggravated murder charge. The court denied the motion.

{¶ 77} Reviewing proposed jury instructions, the trial court noted and rejected defense counsel's objection to the consciousness of guilt instruction. The court instructed the jury:

> Testimony was admitted indicating the Defendant fled the scene. You are instructed by Defendant – you are instructed by Defendant fleeing the scene alone does not raise a presumption of guilt, but it may tend to indicate the Defendant's consciousness of guilt in this case.
> If you find that the facts do not support that the Defendant fled the scene, or if you find that some other motive prompted the Defendant from fleeing the scene, or if you are unable to decide what the Defendant's

20.

motivation was, then you should not consider this evidence for any purpose.

However, if you find that the facts support that the Defendant fled from the scene, and if you decide that the Defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the Defendant is guilty of crimes charged in this case. You alone will determine what weight, if any, to give to this evidence.

{¶ 78} Defense counsel further requested that the jury be instructed on the inferior offense of voluntary manslaughter based on serious provocation. The court denied the request finding any provocation insufficient to justify the use of deadly force.

{¶ 79} Following closing arguments, jury instructions and deliberations the jury returned guilty verdicts on complicity to aggravated murder, murder, and felonious assault with firearm specifications, tampering with evidence, carrying a concealed weapon, improperly handling a firearm in a motor vehicle, with forfeiture specifications.

{¶ 80} This appeal followed Owens' May 15, 2023 sentencing.

## II. Assignments of Error

{¶ 81} Owens raises 13 assignments of error on appeal:

**Assignment of Error I**: Trial counsel provided ineffective assistance of counsel through the failure to investigate available evidence and the failure to present a defense.

**Assignment of Error II**: Trial counsel provided ineffective assistance of counsel through the failure to cross examine witnesses on extreme instances of contradictory, and even incriminating statements of witnesses for the state.

**Assignment of Error III**: Ineffective assistance of counsel for failure to seek the suppression of all evidence obtained from the warrantless search of Jacob Owens' bags and belongings.

21.

**Assignment of Error IV**: Ineffective assistance of counsel for failure to object to the admission of heavily prejudicial evidence for which admission for which admission was barred by Ohio Evid.R. 403, 404, 701, 703 or 801.

**Assignment of Error V**: The trial court erred in admitting prejudicial hearsay evidence over objection as well as prejudicial evidence for which there was no probative value.

**Assignment of Error VI**: The trial court erred, over objection, in not providing the jury with an instruction on the inferior offense.

**Assignment of Error VII**: The trial court erred, over objection, in admitting Mr. Owens' pro se motion, sent to the court in letter form, objecting to the insufficiency of the evidence against him and other legal issues, and permitting the state to draw improper inferences from Mr. Owens' motion contrary to Evid. Rule 403, and or plain error occurred in this instance.

**Assignment of Error VIII**: The trial court erred in admitting cumulative prejudicial photos over the objection of counsel where the photos had no probative value.

**Assignment of Error IX**: The convictions in this case are insufficient of evidence.

**Assignment of Error X**: The trial court erred in giving an instruction on consciousness of guilt.

**Assignment of Error XI**: The convictions before the court are contrary to the manifest weight of the evidence.

**Assignment of Error XII**: The prosecution engaged in misconduct to such a degree and scope that the convictions must be reversed.

**Assignment of Error XIII**: The cumulative effect of the above errors requires reversal.

## III. Analysis

### A. Ineffective Assistance of Counsel and Plain Error

{¶ 82} Owens' first four assignments of error argue that trial counsel provided constitutionally ineffective representation. Ineffective representation claims require a defendant prove two elements: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Proof of prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. Judicial review of trial counsel's performance must be highly deferential. *State v. Greer*, 2023-Ohio-103, ¶ 15 (6th Dist.), citing *Bradley* at 142.

{¶ 83} Owens further claims that plain error resulted from the admission of any unobjected to "inadmissible" evidence. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Plain error will be recognized only where, but for the error, the outcome of the case would clearly have been different." *State v. Vasquez*, 2024-Ohio-2496, ¶ 25 (6th Dist.), citing *State v. Roby*, 2022-Ohio-223, ¶ 19 (6th Dist.). The Supreme Court of Ohio has cautioned that "[p]lain error should be noticed only 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Echols*, 2024-Ohio-5088, ¶ 50, quoting *State v. Clayton*,

23.

62 Ohio St.2d 45, 47 (1980). This court will review Owens' claimed errors under both standards.

{¶ 84} Owens' first assignment of error is that counsel ineffectively failed to review the BWC videos not played at trial, which would have provided multiple witness statements supporting the drive-by shooting theory. Owens claims that defense counsel failed to highlight the fact that Rosario and Dreyer presented "multiple versions" of their stories negatively impacting Owens as he was the "odd man out," being new in town and not part of Dana Dreyer's family. Owens takes umbrage with the State's characterization of the storage compartment in the Dodge Journey as a "secret compartment" or that the gun had even been placed there.

{¶ 85} Notably, there is no evidence that trial counsel failed to review the BWC videos prior to trial. Examining the record, including the BWC videos in the record but not viewed by the jury, this court is not convinced that the unaired videos, or portions of videos, provide any real support for the theory propounded by Owens. While true that one partygoer, Correon Martin, stated at the scene and again the next day that a car pulled up and shots were fired, the State proceeded under the theory that the fatal shot came from a party guest in close proximity to T.T. The State supported this theory with ample testimony and evidence, including direct eyewitness testimony, the security camera video, cell phone records, evidence regarding the bullet wound, and the locations of the relevant parties. Thus, any argument that further investigation would have aided Owens' defense is speculative and is not sufficient to demonstrate prejudice. *See State v.*

24.

*Poupard*, 2018-Ohio-777, ¶ 15 (6th Dist.), citing *State v. Kennard*, 2016-Ohio-2811, ¶ 26 (10th Dist.).

{¶ 86} Owens claims that counsel failed to capitalize on Rosario's and Dreyer's "multiple versions" of their stories and that he presented no real defense theory. We disagree. It is apparent from the trial transcript that Owens' defense centered on the credibility of the accomplice testimony and the lack of any independent eyewitness corroboration. Accordingly, Owens' first assignment of error is not well-taken.

{¶ 87} In his second assignment of error, Owens asserts that defense counsel ineffectively failed to thoroughly cross-examine witnesses including Rosario, Detective Cook, and Hill on testimony regarding the Glock and its recovery, D.H.'s shooting of his weapon at the scene, the vomit Hill claimed was his but K.K. said "would come back to [her] if tested," and the alleged arrival of a red car during the relevant timeframe. Owens claims that these "profound" failures require reversal.

{¶ 88} "Generally, whether to cross-examine witnesses and the extent of that cross-examination is a tactical matter committed by the discretion of trial counsel and cannot form the basis for an ineffective assistance of counsel claim." *State v. Ellison*, 2003-Ohio-6748, ¶ 33 (6th Dist.). Claims may succeed only when counsel's actions clearly fall below the required professional standard. *Id.*

{¶ 89} Owens contends that defense counsel ineffectively failed to cross-examine Rosario on the fact that he gave two versions of how he came into possession of the Glock. Rosario testified that he found the gun while he and Lewis were cleaning the car.

25.

However, while retrieving the gun with police he told them that Dreyer gave it to him in a bag and told him to get rid of it. Owens also cites the BWC video of police interviewing Lewis about Dreyer's initial statement that he and Rosario found the gun in the car. Lewis consistently denies finding the gun; he states that he only collected garbage which he then disposed of. Police re-questioned Dreyer, who clarified that only Rosario found the gun when he went to the car to get something.

{¶ 90} Reviewing Rosario's testimony, while it may have been helpful to the jury to have clarification regarding the gun's location, his statements to police at the Snyder's Ditch do not clearly contradict his trial testimony that he initially found the gun in the car. Thus, there is no indication that had Rosario been cross-examined on this statement, the outcome of the trial would have been different. Owens' second assignment of error is not well-taken.

{¶ 91} Owens' third assignment of error contends that defense counsel ineffectively failed to file a motion to suppress evidence stemming from the warrantless search of his fanny pack and seizure of his cell phone from Dreyer's apartment. The State asserts that a motion to suppress would have been denied because Dreyer gave officers permission to search her apartment and police observed a magazine that fit a Glock sticking out of the open fanny pack. Further, police had probable cause to believe the cell phone contained evidence regarding the shooting and seized the phone to prevent its destruction.

26.

**{¶ 92}** Counsel is not ineffective simply by failing to file a motion to suppress. *State v. Norales-Martinez*, 2018-Ohio-4356, ¶ 21 (6th Dist.), citing *State v. Reynolds*, 2017-Ohio-1478, ¶ 61 (6th Dist.). "The defendant must show that (1) there was a valid ground to suppress the disputed evidence, (2) there was a reasonable probability of success on the motion; and (3) there was a reasonable probability that suppression of the evidence would have changed the outcome of the trial." *Id.*, citing *State v. Clark*, 2010-Ohio-2383, ¶ 21 (6th Dist.); *State v. Thompson*, 2013-Ohio-1597, ¶ 8 (6th Dist.). "Claims of ineffective assistance of counsel are not successful when trial counsel's failure to file a motion to suppress was a tactical decision, there was no reasonable probability of success, or there was no prejudice." *State v. Barnhart*, 2019-Ohio-5002, ¶ 32 (6th Dist.), citing *State v. Nields*, 93 Ohio St.3d 6, 34 (2001).

**{¶ 93}** Generally, warrantless searches and seizures are per se unreasonable unless a delineated exception applies. *State v. Garcia*, 2024-Ohio-1509, ¶ 19 (6th Dist.), citing *State v. Stanberry*, 2003-Ohio-5700, ¶ 14 (11th Dist.). A warrantless search may be valid in cases of consent, *State v. Chandler*, 2015-Ohio-396. ¶ 25 (6th Dist.), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), the existence of an exigent circumstance, including the fear that potential evidence may be destroyed, *State v. Stacey*, 2013-Ohio-4422, ¶ 7 (6th Dist.), or probable cause that an item in plain view is contraband. *Garcia* at ¶ 17, quoting *State v. Levengood*, 2016-Ohio-1340 ¶ 20 (5th Dist.).

27.

{¶ 94} In addition, a warrantless seizure may be appropriate "where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime." *State v. Hidey*, 2016-Ohio-7233, ¶ 13 (5th Dist.). "[T]he Fourth Amendment permits seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Id.*, citing *United States v. Place*, 462 U.S. 696, 701 (1983). Because the nature of a seizure, implicating possessory interests, is generally less intrusive than a search, implicating privacy interests, the United States Supreme Court has frequently approved a warrantless seizure of property on the basis of probable cause, for the time necessary to secure a warrant. *Id.*, citing *Segura v. United States*, 468 U.S. 797, 806 (1984).

{¶ 95} It is undisputed that Dreyer consented to a search of her apartment. During the search, police located Owens' fanny pack and cell phone. Video evidence presented at trial show police in the area where Owens slept locating an unzipped fanny pack and that a magazine fitting the Ghost Glock was plainly visible protruding from the bag. At the time of the discovery, police had arrested Owens as a suspect in the shooting so the gun magazine could reasonably be considered as evidence of the crime. The fanny pack, thus, could be searched and seized without a warrant.

{¶ 96} Next, the State contends that police properly seized Owens' cell phone to prevent the destruction of evidence and obtained a search warrant prior to accessing its contents. Because Owens was a suspect in T.T.'s homicide and police located a fanny

28.

pack containing a magazine next to the phone, police had probable cause to believe that the phone contained evidence of the crime and exigent circumstances allowed its seizure. *Hidey*, *supra.* Accordingly, Owens' counsel was not ineffective by failing to file a motion to suppress. Owens' third assignment of error is not well-taken.

{¶ 97} Owens' fourth assignment of error claims that counsel ineffectively failed to object to inadmissible evidence including Officer Cook's BWC video of victim, T.T., following the shooting, C.S.'s recorded police station interview, and multiple "conclusory" police statements regarding the physical locations of individuals in relation to T.T. and the identity of the perpetrator.

{¶ 98} Owens claims that the images of T.T., mortally wounded, were "outrageously prejudicial." The State conversely maintains that the footage relevantly depicted the crime scene when police first arrived. While the video does show T.T. on the ground and unresponsive, it is not overly graphic or gruesome. The video evidences the chaotic scene when police first arrived, including those in the immediate area. The argument is rejected.

{¶ 99} Owens further contends that trial counsel ineffectively failed to object to C.S.'s police interview on hearsay grounds. The State asserts that the statements were admissible as excited utterances. Based upon our disposition of Owens' fifth assignment of error, below, the argument is not well-taken.

{¶ 100} Owens' final argument is that defense counsel ineffectively failed to object to conclusory police testimony regarding the locations of various individuals at the

29.

time of the shooting based on the physical evidence found at the scene. The State contends that the evidence was admissible under Evid.R. 701, because it was based on police experience and specialized training and their perceptions during the investigation.

{¶ 101} Evid.R. 701 allows lay witnesses to express opinions that are (1) rationally based on the witness's perception or knowledge of the subject, and (2) helpful to a clear understanding of the testimony or to the determination of a fact in issue. Under Evid.R. 701, "[c]ourts have found that detectives or other investigators can opine on issues such as blood spatter, either as an expert or a lay witness giving opinion testimony." *State v. Bankston*, 2021-Ohio-4332, ¶ 32 (11th Dist.).

{¶ 102} During trial, police testified that based on physical evidence such as T.T.'s location after the shooting, the shell casing, and Hill's vomit and witness' interviews, they placed Owens' location at the scene within a circle which would implicate him as the shooter. On review, the testimony at issue was based on firsthand knowledge and aided the jury in determining who shot T.T. Thus, counsel was not ineffective in failing to object to this testimony.

{¶ 103} In addition, because there are no meritorious, unobjected to errors there can be no plain error. Crim.R. 52(B). Owens' fourth assignment of error is not well-taken.

## B. Admissibility of Evidence

{¶ 104} Owens' fifth, seventh, and eighth assignments of error challenge the admission of "prejudicial" evidence. Owens' fifth assignment of error claims that the

30.

court, over objection, erred by allowing the admission of hearsay evidence. Owens contends that a portion of C.S.'s testimony was hearsay as well as the entirety of her police interview. The State concedes that the disputed portion of C.S.'s live testimony was hearsay but contends harmless error as to its admission. The State claims that the playing and admission of C.S.'s police interview video was proper under the excited utterance exception.

{¶ 105} Unlike the discretion afforded a court in the admission or exclusion of evidence, a court's admission of hearsay "'is reviewed in light of Evid.R. 103(A) and the standard established in Crim.R. 52(A), providing that such errors are harmless unless the record demonstrates that the errors affected a party's substantial right.'" *State v. Richcreek*, 2011-Ohio-4686, ¶ 31 (6th Dist.), quoting *State v. Sorrels*, 71 Ohio App.3d 162, 165 (1st Dist.). On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule. *Id.* at ¶ 32.

{¶ 106} At trial, C.S. testified:

> Q: Okay. Did you hear the Defendant indicate to [T.T.] that he was going to shoot him?
> A: Um, it wasn't verbally said to me. It was repeated to me.
> Q: Okay. And had –
> Mr. Toth: Objection, hearsay, Your Honor.
> Court: Overruled.
> Q: Was there any conversation that you had with Jacob where he indicated that he had shot somebody else?
> A: It was not said to me, no. It was said to someone else. It was repeated to me.

31.

{¶ 107} During the police interview immediately following the shooting, C.S. stated to police that she heard Owens threaten to shoot T.T. and she heard him say that he shot someone in New Jersey.

{¶ 108} The State concedes that the above-quoted trial testimony should have been excluded as hearsay but maintains that any error is harmless because it was cumulative to the properly admitted statements she made during her police interview.

{¶ 109} C.S.'s police interview statements were admitted under the excited utterance exception under Evid.R. 803(2).

> A statement which is otherwise considered hearsay may be admissible as an excited utterance when the following four criteria are met: "(1) a startling event, (2) a statement relating to that event, (3) a statement made by a declarant with firsthand knowledge, and (4) a statement made while the declarant was under the stress of the excitement caused by the event."

*State v. Ford*, 2021-Ohio-3058, ¶ 36 (6th Dist.), quoting *State v. Dean*, 2015-Ohio-4347, ¶ 123. There is no set time frame under which a statement can no longer be considered an excited utterance. *State v. Wampler*, 2016-Ohio-4756, ¶ 34 (6th Dist.), quoting *State v. Taylor*, 66 Ohio St.3d 295, 303 (1993). The relevant inquiry is whether the declarant is still under the stress or excitement of the event. *Id.*, citing *State v. Fox*, 66 Ohio App.3d 481, 489 (6th Dist. 1990).

{¶ 110} In the present case, police interviewed C.S. within a few hours of the shooting and she was still visibly upset. C.S. had a close relationship with T.T. and held his head in her lap while he lay on the ground dying. Based on these facts, although the court erred by overruling the hearsay objection during C.S.'s trial testimony, such error is

32.

harmless because of the proper admission of similar statements she made during her police interview. Owens' fifth assignment of error is not well-taken.

{¶ 111} Owens' seventh assignment of error claims that the trial court erred, over objection, by allowing a State's witness to read a letter Owens wrote to the court which states that "momentary premeditation is no longer sufficient to sustain a conviction for the offense of aggravated murder." Owens claims that under Evid.R. 403, the prejudicial effect of the letter outweighed its probative value.

{¶ 112} Evid.R. 801(D)(2), allows, as nonhearsay, a party's own statement to be used against him or her. Reviewing the letter in which Owens also specifically denies merit in any of the charges, it is admissible Evid.R. 801(D)(2). Regardless, it had little probative value. Owens' seventh assignment of error is not well-taken.

{¶ 113} In his eighth assignment of error, Owens claims prejudice in the admission of four photographs, over objection, depicting T.T., deceased, at the hospital. He states that he stipulated to the cause of death and that under Evid.R. 403, the probative value of the photographs is outweighed by the prejudicial effect.

> "Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. To be certain, a trial court may reject a photograph, otherwise admissible, due to its inflammatory nature if on balance the prejudice outweighs the relevant probative value. However, the mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible. 'The trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.'"

33.

(Citations omitted). *State v. McCullough*, 2020-Ohio-4703, ¶ 44 (6th Dist.), quoting *State v. Maurer*, 15 Ohio St.3d 239, 264 (1984).

{¶ 114} The photographs at issue depict the bullet's entry and exit points. And, in addition to the coroner's report, the photographs demonstrated the bullet's trajectory and aided police in identifying the shooter's and T.T.'s precise locations at the scene. They are neither cumulative nor overly graphic. Owens' eighth assignment of error is not well-taken.

### C. Jury Instructions

{¶ 115} Owens' sixth assignment of error claims that the court erred by failing to instruct the jury on the inferior-degree voluntary manslaughter offense. He contends that during the trial, the State presented insufficient evidence of premeditation and that Owens suffered serious provocation stemming from the fight amongst partygoers.

{¶ 116} A trial court's instructions to a jury are reviewed for an abuse of discretion. *State v. Peabody*, 2024-Ohio-185, ¶ 83 (6th Dist.), citing *State v. White*, 2013-Ohio-51, ¶ 97 (6th Dist.). "A trial court is obligated to provide jury instructions that correctly and completely state the law." *State v. Nye*, 2021-Ohio-2557, ¶ 14 (6th Dist.). "The jury instructions must also be warranted by the evidence presented in a case." *Id.*; *see State v. Knuff*, 2024-Ohio-902, ¶ 182 ("[R]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction.").

34.

{¶ 117} The aggravated murder statute, R.C. 2903.01(A), under which Owens was convicted, provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" Voluntary manslaughter, R.C. 2903.03, prohibits knowingly causing the death of another but includes the element of serious provocation triggering a sudden fit of passion or rage sufficient to incite the use of deadly force.

{¶ 118} Denying the request, the trial court stated:

> The Court really weighed this out and it came down to the sudden passion or fit of rage definition. The Defendant claims at the time of the offense he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the Defendant into using deadly force and that was the concern of the Court, and the Court focused on it, and I – the Court's actually the one that brought it to both parties' attention is the fact that Timothy Hill had testified not only that there was not this provocation, but that he brought the gun out of the car, but then he went and put it back in the car. . . . [H]e distanced himself from that firearm, and in doing so, there would not be any reason to believe that it would incite the Defendant to use deadly force, because any deadly force that Mr. Hill had he had discarded.

{¶ 119} In addition to the trial court's comments, the trial testimony showed that after Hill hit T.T., breaking his own arm, D.H. hit T.T. twice and the physical fight ended. Only then did Owens pull his weapon and shoot T.T., who was unarmed.

{¶ 120} Based on the foregoing, the trial court did not abuse its discretion by determining that evidence did not warrant instructing the jury on voluntary manslaughter. Owens' sixth assignment of error is not well-taken.

35.

{¶ 121} Owens' tenth assignment of error asserts that the trial court erred by instructing the jury on consciousness of guilt because the State presented insufficient evidence that he fled the scene.

> "A jury instruction on flight is appropriate if there is sufficient evidence in the record to support the charge." *State v. Johnson*, 6th Dist. Lucas No. L-03-1206, 2005-Ohio-1222, ¶ 14. "Flight means some escape or affirmative attempt to avoid apprehension. It can take form of fleeing from the police or eyewitnesses, to changing or disguising one's physical characteristics after the fact." *State v. Wesley*, 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19, citing *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1207 (9th Cir.1991).

*State v. Herrell*, 2017-Ohio-7109, ¶ 24 (6th Dist.)

{¶ 122} Here, the State presented evidence that during the affray, Owens placed a call to Dreyer, and D.H. called his brother, Hill. Both Dreyer and Hill arrived at the party in separate cars just before the shooting. Immediately after T.T. was shot, Owens and his associates left the area in the vehicles. D.H. testified that immediately after the shooting, the group tried to check into a hotel to avoid detection either by police or by T.T.'s friends and family. Further, the State presented testimony supporting the theory that Owens hid his gun in Dreyer's vehicle in the compartment under the passenger seat. Based on these facts, it could reasonably be determined that Owens fled the scene to avoid apprehension. Thus, the instruction was applicable to the facts of this case. Owens' tenth assignment of error is not well-taken.

36.

## D. Sufficiency and Manifest Weight of the Evidence

{¶ 123} Owens' ninth and eleventh assignments of error contend that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶ 124} Insufficiency and manifest weight are distinct legal theories." *State v. Fenderson*, 2022-Ohio-1973 (6th Dist.) ¶ 73. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 125} In contrast, when reviewing a manifest weight claim,

> "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.*, quoting *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 126} Owens first asserts that insufficient evidence supports his complicity to aggravated murder conviction because the State failed to establish the element of prior calculation and design. He states that, at best, the "facts support a 'momentary impulse' made under heavy duress." Aggravated murder, R.C. 2903.01(A), provides: "No person shall purposely, and with prior calculation and design, cause the death of another or the

37.

unlawful termination of another's pregnancy." A person is complicit in an offense under R.C. 2923.03(A)(2), where he or she, "with the kind of culpability for the commission of the offense," "aid[s] or abet[s] another in committing the offense."

> In determining whether a defendant acted with prior calculation and design the state must show that the accused killed the victim purposefully after devising a plan or scheme to kill. *State v. Davis*, 8 Ohio App.3d 205, 206–207, 456 N.E.2d 1256 (8th Dist.1982). "There must be some kind of studied analysis with its object being the means by which to kill." *Id.* While the degree of care and the length of time the offender takes to ponder the crime beforehand are not critical factors in themselves, "momentary deliberation" is insufficient. *State v. Taylor*, 78 Ohio St.3d 15, 22, 676 N.E.2d 82 (1997). Whether there exists prior calculation and design is a factual determination resolved on a case-by-case basis. *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001).

*State v. Ross*, 2017-Ohio-675, ¶ 33-34 (6th Dist.)

{¶ 127} Courts generally consider three factors in determining whether a defendant acted with prior calculation and design: (1) whether the accused and victim know each other, and if so, whether that relationship was strained; (2) whether the accused gave thought or preparation to choosing the murder weapon or murder site; and (3) whether the act was drawn out or whether it was an almost instantaneous eruption of events. *State v. Walker*, 2016-Ohio-8295, ¶ 20, quoting *Taylor* at 19. "'[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes.'" *State v. Mathis*, 2020-Ohio-3068, ¶ 80 (6th Dist.), quoting *State v. Coley*, 93 Ohio St.3d 253, 264 (2001). "Evidence of prior calculation and design includes facts which demonstrate that appellant's conduct 'went beyond a

38.

momentary impulse and show that he was determined to complete a specific course of action.'" *Id.*, quoting *State v. Conway*, 2006-Ohio-791, ¶ 46.

{¶ 128} Reviewing the evidence presented at trial in a light favorable to the State, sufficient evidence supports the prior calculation and design element. C.S. testified that Owens' dispute with T.T. began after J.K. spilled juice in her kitchen. The groups migrated outside to fight. D.H. called his brother, Hill, to fight T.T. After the fight between Hill and T.T. ended and prior to the shooting, Owens placed two calls to Dreyer who pulled up approximately eight minutes later. This fact supports the State's theory that Owens planned to shoot T.T. and needed a quick getaway.

{¶ 129} Owens further contends that insufficient evidence supports his tampering with evidence conviction because he had been incarcerated and was not involved in the Rosario/Dreyer Glock disposal "scheme." Tampering with evidence, R.C. 2921.12(A)(1), prohibits an individual "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall ... [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"

{¶ 130} Reviewing the evidence presented at trial, sufficient evidence demonstrates that Owens hid the gun in the passenger seat compartment to avoid its detection.

{¶ 131} Owens next asserts that the jury verdicts were against the weight of the evidence because the evidence presented implicated others, including Rosario, Hill, or

39.

D.H., but not Owens. Reviewing the trial testimony and evidence, this is not a case where the jury lost its way by finding Owens guilty of T.T.'s murder. The spent shell casing found at the scene matched Owens' gun. The location of the casing, T.T.'s body and the gunshot entry and exit wounds, and testimony regarding Owens' location during the events were consistent. Hill and D.H both testified that Owens shot T.T. Just prior to the shooting Owens called for a ride and immediately fled thereafter. Finally, his Glock was disassembled and thrown into a creek.

{¶ 132} Based on the foregoing, Owens' convictions were supported by sufficient evidence and were not against the weight of the evidence. Owens' ninth and eleventh assignments of error are not well-taken.

### E. Prosecutorial Misconduct

{¶ 133} In his twelfth assignment of error, Owens contends that the prosecution engaged in misconduct by admitting inadmissible evidence, fabricated evidence, and misstating evidence during closing arguments. "'The two-fold test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant.'" *State v. Carswell*, 2023-Ohio-4574, ¶ 42, (6th Dist.), quoting *State v. Holbrook*, 2015-Ohio-4780, ¶ 32 (6th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 165 (1990). "'Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and

40.

whether the evidence of guilt was overwhelming.'" *Norales-Martinez*, 2018-Ohio-4356, at ¶ 32, quoting *State v. Oviedo*, 1997 WL 525087 (6th Dist. Aug. 15, 1997)

**{¶ 134}** Based on our resolution of Owens' assignments of error relating to ineffective assistance of counsel and the admission of certain evidence, the only "inadmissible evidence" pertains to C.S.'s hearsay statements that the trial court allowed over objection. The statement was an isolated incident; there is no indication that the State intended to elicit hearsay testimony. Reviewing the evidence as a whole, Owens cannot demonstrate that the statement denied him a fair trial.

**{¶ 135}** Additionally, although the State presented conflicting evidence regarding the disposal of the Ghost Glock and a statement by at least one individual that shots were fired from a vehicle that pulled up, it does not follow that the State purposely admitted fabricated testimony or misled the jury. Inconsistences among witnesses following a chaotic and traumatic event are commonplace, it is the jury's role to assess the veracity of the witnesses and the quality of evidence presented at trial.

**{¶ 136}** Owens also contends that during closing argument, the prosecutor mischaracterized evidence presented at trial by stating: "And what does the Defendant do? He flees from the scene with his Ghost Glock gun then hides it in the Dodge Journey in that hidden compartment that we saw the photographs of and we heard testimony."

**{¶ 137}** It is well-established that a prosecutor is entitled to latitude during closing arguments, *State v. Boles*, 2009-Ohio-512, ¶ 47 (6th Dist.), citing *State v. Ballew*, 76 Ohio St.3d 244 (1996), and may "comment freely on 'what the evidence has shown and

41.

what reasonable inferences may be drawn therefrom.'" *Id.*, quoting *Lott*, 51 Ohio St.3d at 165.

{¶ 138} Evidence presented at trial identified the Ghost Glock as the gun that fired the spent shell casing found at the scene. Photographs and texts extracted from Owens' cell phone identified him as the owner of the gun. While searching Dreyer's apartment, police recovered only the guns she legally owned and stored in a safe. Rosario testified that he found the gun in the passenger seat compartment and Owens had been in the vehicle immediately after the shooting. Based on this evidence, a reasonable inference could have been made that Owens placed the gun in the compartment after the shooting. Owens' twelfth assignment of error is not well-taken.

### F. Cumulative Error

{¶ 139} Owens' final assignment of error contends that the cumulative errors made at trial require reversal. Under the cumulative error doctrine, "'a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singly.'" *State v. Gilmer*, 2024-Ohio-1178, ¶ 104 (6th Dist.), quoting *State v. Williams*, 2002-Ohio-4831, ¶ 36 (6th Dist.).

{¶ 140} Reviewing Owens' claimed errors, this court did not conclude that there were multiple errors at trial; thus, there can be no cumulative error. *Gilmer* at ¶ 104, citing *State v. Moore*, 2019-Ohio-3705, ¶ 87 (6th Dist.). Owens' thirteenth assignment of error is not well-taken.

42.

## IV. Conclusion

**{¶ 141}** Upon due consideration, the judgment of the Erie County Court of Common Pleas is affirmed. Pursuant to App.R. 24, Owens is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See, also*, 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Charles E. Sulek, P.J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.